W. Adam Duerk, Esq.
Giovanna M. McLaughlin, Esq.
MILODRAGOVICH, DALE
STEINBRENNER & NYGREN, P.C.
Attorneys at Law
P.O. Box 4947
Missoula, Montana 59806-4947
Telephone: (406) 728-1455
Fax No: (406) 549-7077
Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

MISSOULA DIVISION

| | |
|---|---|
| CELIA KEITH, individually and as Personal Representative of THE ESTATE OF GLEN KEITH, Deceased,<br><br>Plaintiffs,<br><br>-vs-<br><br>COMMUNITY NURSING, INC., d/b/a VILLAGE HEALTH CARE CENTER; THE GOODMAN GROUP, LLC; and JOHN DOES I-X, as natural persons, partnerships, limited liability companies, or corporations involved in the operation of Village Health Care Center,<br><br>Defendants. | Cause No. CV-09-24-M-DWM-JCL<br><br>**COMPLAINT AND DEMAND FOR JURY TRIAL** |

COME NOW the Plaintiffs, by and through their counsel of record, and hereby allege as follows:

### PARTIES

1. Plaintiff Celia Keith is a resident of Mineral County, Montana, and is the widow and Personal Representative of the Estate of the decedent, Glen Keith, (hereafter "Glen").

**COMPLAINT AND DEMAND FOR JURY TRIAL** - Page 1

2. Defendant Community Nursing, Inc., d/b/a Village Health Care Center is a corporation with a principal place of business in Minnesota and exists under the laws of a state other than Montana. Community Nursing, Inc.'s address is 1107 Hazeltine Blvd. #200, Chaska, MN 55318.

3. Defendant Goodman Group, LLC ("Goodman LLC") is a limited liability company existing under the laws of a state other than Montana. Goodman LLC's address is 1107 Hazeltine Blvd. #200, Chaska, MN 55318. Goodman LLC assists with management of Village Health Care Center, and its acts and omissions give rise to this action occurred in Montana.

4. Village Health Care Center ("Village") is a skilled nursing care facility located in Missoula, Montana and subject to all state and federal laws governing skilled nursing care facilities.

5. Community Nursing, Inc., d/b/a Village Health Care Center and Goodman LLC ("Defendants") collectively own and manage Village. These Defendants are directly and indirectly liable, under the theory of vicarious liability, for the acts and omissions recited herein.

6. Defendants JOHN DOES I-X are natural persons, partnerships, limited liability companies or corporations currently unknown to Plaintiff, and may be liable for any and all claims set out below.

## JURISDICTION

7. Jurisdiction in this Court is proper based on diversity of citizenship of the Plaintiff and Defendants and due to the fact that the matter in controversy exceeds, exclusive of interest and costs, the sum specified by 28 U.S.C. § 1332.

## FACTS COMMON TO ALL CLAIMS

8. At the time of the incident in question, Defendants were in the business of providing healthcare services to the general public for long-term resident care at Village.

9. Defendants promoted and marketed Village as suitable for long-term

care residents, stating in promotional literature that:

> Today, our residents are not only living well into their 100's they're *thriving*. Our communities focus on keeping people growing, not aging.

10. Defendants were responsible for managing and operating Village, which provided care for Glen. Part of this responsibility was to ensure Village was adequately stocked with appropriate fall prevention/protection devices.

11. Defendants had a duty to supervise and train Village's nursing staff.

12. This duty included a responsibility to ensure that Village was staffed by the appropriate number of suitably trained and effective personnel, including an administrator, a medical director, director of nursing, nursing staff and nurse aides.

13. Several other duties are set out in part in the Management Agreements between Community Nursing, Inc. and the Sage Company, attached as Exhibit A. The Management Agreement was allegedly assigned by the Sage Company to Goodman, LLC on January 1, 2007.

14. These duties are also represented by the corporate command structure of the Defendants, which rely on regional directors and managers to manage, supervise and train the administrative, medical and nursing staff at Village.

15. The Defendants' duties to manage and supervise the staff at Village are expressed in other ways as well, to wit; forming the governing body pursuant to pursuant to 42 C.F.R. 483.75(d); forming and coordinating the Quality Assurance Committee; communicating with Village regarding compliance issues related to various regulations and standards of care; establishing and giving final approval for a budget for Village that determines the number of direct care staff at Village and the inventory of fall prevention/protection devices at Village; participating in formulating an approach to responding to deficiency statements issued by the State of Montana; advising Village regarding responses to serious incidents at Village and participating in the risk management process; drafting

policies, procedures and protocols for each facility that govern the day-to-day operations at Village; paying all accounts payable and other bills for Village; billing for all resident services; overseeing the clinical training program; maintaining the physical plant; tracking the daily care-giver to resident ratio on a daily basis; hiring, training and supervising Village's administrator; ensuring that each patient receives appropriate care from a physician; ensuring the accuracy of residents' medical charts; communicating accurate and truthful information to authorized representatives and family members regarding residents' health status and the ability of the facility to provide services to residents; communicating accurate and truthful information regarding staffing levels and adequacy of care to State and Federal agencies; and participating in the ongoing training process for other staff.

16. Previous lawsuits against the Defendants and Goodman LLC's other healthcare facilities have put Defendants on notice of past failures to appropriately manage and staff nursing facilities in Montana and elsewhere.

17. Notices of Deficiency from the Montana Department of Public Health and Human Services have put Defendants on notice of past failures to comply with state and federal regulations regarding the appropriate standard of care.

18. Glen became a resident patient at Village on February 12, 2008, after signing an agreement (the "Agreement") with Village, attached hereto and incorporated by reference as Exhibit B.

19. Glen was predisposed to falls. He had limited mobility and was wheelchair and bed bound upon his admission to Village.

20. On admission, the staff at Village was aware that Glen was a fall risk and was aware of his other medical issues based on a physical exam and medical records forwarded from St. Patrick's Hospital and Providence. Village documented that Glen was a fall risk in its February 12, 2008 Fall Assessment and other admission assessments.

<u>**COMPLAINT AND DEMAND FOR JURY TRIAL**</u> - Page 4

21. Glen's initial Fall Care Plan at Village on admission reflected that fall precautions were to be in place in his care, including, but not limited to: placement on the "falling star" program, placement of a fall mat under his bed; the use of a high-low bed; and the use of a fall monitor and/or pull tab alarm.

22. On February 13, 2008, Village represented to the Montana Department of Health and Human Services that it was using a high-low bed as part of Glen's care.

23. On February 15, 2008, Glen was found on the floor by Village staff after falling from his bed and suffered a minor injury to his toe. At the time of Glen's first fall, Village had not placed Glen on the "falling star" program, did not have a fall mat under his bed, did not have a high-low bed in place, and did not have a fall monitor and/or pull tab alarm in place. After Glen's first fall, Glen's wife, Celia, was informed by Village staff that Village would immediately institute these fall prevention measures.

24. Instead of implementing the promised fall prevention measures, Village staff altered and/or edited Glen's Fall Care Plan, resulting in the apparent reduction of the fall prevention measures to be used in his care.

25. Glen's physician was not part of approving the changes in his Fall Care Plan that resulted in the reduction of fall prevention measures to be used in his care.

26. At some point during the night of February 23, 2008, Glen fell from his bed and sustained a head injury. He broke his nose and bled onto the floor. It is unknown precisely how long he remained on the floor before he was found by nursing staff. Glen's fall either caused or contributed to intracranial bleeding which ultimately caused his death.

27. Glen was transferred the following morning by ambulance to Community Medical Center as a result of the injuries incurred in his fall.

28. Community Medical Center diagnosed Glen with a nasal laceration

and nasal contusion. No x-rays or CT scans were performed. Per Glen's discharge instructions, Glen was to return promptly or contact a doctor if he experienced headache, excessive drowsiness or repeated vomiting or dizziness.

29.   On February 25, 2008, Village finally provided Glen with a high-low bed, a floor alarm mat, and placed him on the "extended falling star program."

30.   Immediately after his second fall, Glen's mental and physical condition began to deteriorate, prompting Celia to contact Glen's doctor, Dr. Gorman, who was also Village's Medical Director. Celia complained that Glen was experiencing excessive sleepiness, red eyes and cold temperature. Celia also expressed her concerns about Glen's rapidly deteriorating condition to Village staff.

31.   On February 27, 2008, in response to Celia's concerns about Glen's condition, Dr. Gorman's physician assistant, Aaron Derry, visited Glen at Village. In his progress note, Derry notes that the nurse (from Village) agreed that Glen had been suffering from lowered energy. Derry also noted that Glen was experiencing "diffuse fatigue." No treatment was prescribed.

32.   On February 28, 2008, Village's progress notes mentioned that Glen was "very drowsy all shift." During a visit that afternoon, Celia noted that Glen was extremely lethargic, he was unable to focus with his right eye, shivering, continually falling asleep, appeared heavily drugged and could not finish his physical therapy session. Celia expressed her concerns over Glen's condition to two Village nurses and requested that Dr. Gorman be contacted immediately. However, Village failed to procure any medical care for Glen.

33.   On February 29, 2008, Glen was discharged from Village to the hospital after a nurse discovered him having multiple episodes of seizures.

34.   Hospital doctors discovered a new intracranial bleed in Glen's brain.

35.   Hospital physicians gave Glen the choice of attempting to relieve the intracranial pressure or palliative measures and death. They informed him that it

was unlikely that they would be successful in any efforts to stop his intercranial bleeding.

36. According to medical records, Glen died of respiratory arrest, raised intracranial presssure, and intracranial hemorrhage on March 2, 2008.

## COUNT I
## NEGLIGENCE

37. Plaintiffs re-allege and re-state each of the allegations contained in the preceding paragraphs 1 through 37 inclusive.

38. Defendants, through Village, had a custodial relationship with Glen and owed him a duty to provide for his safety and ensure that his care complied with all relevant standards of care as referenced in paragraphs 1 through 36 above, and those standards referenced below in this Complaint.

39. Defendants, through Village, breached their duties by failing to comply with the applicable standards of care and by failing to provide healthcare services in a timely, safe and reasonably prudent manner.

40. As a direct and proximate cause of Defendants' breach, Plaintiffs have sustained damages in amounts to be determined at trial.

## COUNT II
## NEGLIGENCE *PER SE*

41. Plaintiffs re-allege and re-state each of the allegations contained in the preceding paragraphs 1 through 41 inclusive.

42. Mont. Code Ann. § 50-5-1104; 42 CFR §483.10(11); 42 CFR § 483.20; 42 CFR § 483.25; 42 CFR § 483.25(a)(2); 42 CFR § 483.25(h); 42 CFR § 483.30; 42 CFR § 483.75(b); 42 CFR §483.75(f); 42 CFR §483.75(g) and 42 CFR §483.75(l) govern the rights of long-term care facility residents and set out the duties of long-term care facilities.

43. Village is a long-term care facility governed by the foregoing regulations.

44. Defendants, through their acts and omissions, violated the foregoing regulations.

45. These regulations were enacted to protect a specific class of persons; Glen was a member of that protected class; Glen's injuries were of the sort which the statutes were enacted to prevent; the statutes were intended to regulate members of the Defendants' class.

46. Accordingly, these acts and omissions amount to negligence *per se* on the part of the Defendants.

47. As a proximate result of Defendants' negligence *per se*, Plaintiffs have sustained damages in amounts to be determined at trial.

## COUNT III

## MEDICAL AND NURSING MALPRACTICE

48. Plaintiffs re-allege and re-state each of the allegations contained in the preceding paragraphs 1 through 48 inclusive.

49. Defendants, through Village, their agents, servants or employees represented themselves to be competent to perform or render all professional work, labor, services, devices, treatments and tests that were to be rendered to Glen.

50. From February 12, 2008 until February 29, 2008, Defendants, through Village, rendered services to Glen.

51. Defendants, through Village, by their agents, servants or employees, examined and undertook medical and nursing care of Glen.

52. Defendants, through Village, their agents, servants or employees carelessly and negligently failed to care for Glen while he was at Village.

53. In rendering services to Glen, Defendants, through Village, violated their legal duties to him and were negligent by carelessly, negligently, wrongfully and improperly modifying Glen's Fall Care Plan and medical chart; failing to observe standards of care, policies, procedures and protocols relating to adopting

and implementing fall prevention measures for a patient in Glen's condition; failing to recognize and report significant changes in Glen's condition to the appropriate care-givers and authorized representatives; failing to observe all relevant standards of care regarding proper staff numbers, staff hiring, training and supervision; failing to equip Village with an adequate stock of fall prevention/protection devices; and in otherwise being careless and negligent.

54. As a result of the acts and omissions of Defendants, through Village, Glen lost his chance to make a recovery, suffered injuries and died.

55. Defendants' medical and nursing malpractice and negligence, was the proximate and foreseeable cause of Glen's injuries.

56. As a proximate result of Defendants' medical and nursing malpractice, Plaintiffs have sustained damages in amounts to be determined at trial.

## COUNT IV
## NEGLIGENT HIRING, TRAINING AND SUPERVISION

57. Plaintiffs re-allege and re-state each of the allegations contained in the preceding paragraphs 1 through 57 inclusive.

58. Defendants, through Village, have a duty to hire, train and supervise medical and nursing staff attending to resident patients in accordance with the applicable state and federal laws and regulations and standards of care for long term health care facilities.

59. Defendants, through Village, failed to exercise reasonable care in the hiring, training and supervision of staff. Specifically, Defendants failed to ensure that an appropriate number of properly trained caregivers were available at Village to provide care to Glen.

60. Defendants, through Village's failure to appropriately hire, train and supervise their staff members, created an unreasonable risk of harm to a patient in Village's care.

61.  Defendants, through Village knew, or, in the exercise of reasonable care, should have known, that an inadequate number of inadequately hired, trained and supervised staff presented such a risk of harm.

62.  Defendants' failure to appropriately hire, train and supervise the medical and nursing staff, was the proximate and foreseeable cause of Glen's injuries and subsequent death.

63.  As a proximate result of Defendants' negligent hiring, training and supervision, Plaintiffs have sustained damages in amounts to be determined at trial.

## COUNT V
## WRONGFUL DEATH

64.  Plaintiffs re-allege and re-state each of the allegations contained in the preceding Paragraphs 1 through 64 inclusive.

65.  Glen's injuries and ultimate death were caused, in whole or in part, by Defendants' acts and omissions.

66.  Glen left a wife and one surviving adult child as heirs to his estate.

67.  As a result of the their acts and omissions, Defendants are liable for Glen's personal injuries and the medical care necessary to treat his injuries, for pain and suffering, grief and sorrow, loss of care and counsel resulting from Glen's death.

68.  Plaintiffs have suffered damages resulting from Defendants' acts and omissions in amounts to be determined at trial.

## COUNT VI
## SURVIVORSHIP

69.  Plaintiffs re-allege and re-state each of the allegations contained in the preceding paragraphs 1 through 69 inclusive.

70.  As a result of Defendants' acts and omissions, Glen suffered pain and suffering, emotional distress, and other damages, in the interim between his injury

and ultimate death in amounts to be determined at trial.

## COUNT VII
## BREACH OF CONTRACT

71.  Plaintiffs re-allege and re-state each of the allegations contained in the preceding paragraphs 1 through 71 inclusive.

72.  On or about February 12, 2008, Glen and Defendants, through Village, entered into an Agreement.

73.  The Agreement stated that Village would provide medical care and other services for Glen in exchange for valuable consideration.

74.  Defendants breached their contracts with Plaintiffs by failing to provide the care and services promised.

75.  As a direct and proximate result of Defendants' breach of contract, Plaintiffs have been damaged in amounts to be proven at trial.

## COUNT VIII
## ACTUAL FRAUD

76.  Plaintiffs re-allege and re-state each of the allegations contained in the preceding paragraphs 1 through 76 inclusive.

77.  Defendants, through the management at Village, represented to Plaintiffs that they would provide appropriate care for Glen in accordance with their own promotional literature, applicable standards of care, policies, procedures, regulations and protocols for long term health care facilities.  Specifically: (A) On admission in February of 2008, Defendants, through management employees at Village, represented that Village was using a high-low bed, floor mat and a pull/tab alarm prior to Glen's fall on February 23, 2008.  These statements appeared in Glen's Fall Care Plan and were signed by staff at Village. Additionally, after Glen's first fall on February 15, 2008, Village staff represented to Celia that a high-low bed and floor mat would be immediately put in place. (B) On admission at Village and in promotional literature in February 2008,

Defendants, through management staff at Village, represented that they had the capability to provide and were providing the proper amount, type and quality of care from an adequate number of trained staff at Village. (C) In the Agreement, attached as Exhibit B, Defendants, through management staff at Village, represented that they would obtain emergency physician services when required.

78. Defendants' representations were false.

79. Defendants' representations were material to Plaintiffs' decision to choose Village for Glen's rehabilitation.

80. Defendants knew their representations were false. For example: Village has a history of under staffing, with resident to care giver ratios at times exceeding 50:1; a history of complaints of under staffing by the licensed and non-licensed nursing staff; a practice of calling nursing staff back to work to "fill in holes" in residents' medical records days and weeks after the care date to make it appear that care had been received; a practice of calling extra nursing staff to work prior to State survey to avoid deficiencies for under staffing; a practice of putting office staff and untrained workers onto the floor to perform nursing assistant duties. These problems have been communicated to both Village managers and Goodman Group employees.

81. Defendants intended that Plaintiffs rely on their representations and enter into a contract based on their representations.

82. Plaintiffs were not aware that Defendants were not telling the truth or were misrepresenting the facts.

83. Plaintiffs relied on Defendants' representations.

84. Plaintiffs had a right to rely on Defendants' representations.

85. As a direct and proximate result of Plaintiffs' reliance upon Defendants' false representations, Plaintiffs suffered damages in amounts to be proven at trial.

## COUNT IX

## CONSTRUCTIVE FRAUD

86. Plaintiffs re-allege and restate each of the allegations contained in the preceding paragraphs 1-86 inclusive.

87. By failing to inform Plaintiffs that Glen would not and was not receiving the care and treatment promised, Defendants misrepresented the amount and quality of care provided at Village.

88. The Defendants had a duty to disclose all material information concerning the care and treatment they were providing to Glen's authorized representatives.

89. As a result of Defendants' failure to disclose material information that Defendants knew or should have known, the Defendants gained financial advantage to the detriment of Plaintiffs by misleading Plaintiffs to their prejudice.

90. As a direct and proximate result of Defendants' constructive fraud, Plaintiffs have suffered damages in amounts to be proven at trial.

## COUNT X
## NEGLIGENT MISREPRESENTATION

91. Plaintiffs re-allege and restate each of the allegations contained in the preceding paragraphs 1-91 inclusive.

92. Defendants supplied false information to the Plaintiffs, to wit: Defendants stated that Village was prepared to provide the proper amount, type, and quality of care required by Glen. Further, after Glen's first fall, Defendants stated that a high-low bed and floor mat would be immediately put in place.

93. Defendants' representations were made without any reasonable grounds for them to believe that they were true.

94. Defendants' misrepresentations were made to induce Plaintiffs' reliance.

95. Plaintiffs were unaware that Defendants' representations were false.

96. Plaintiffs relied upon Defendants' representations.

97. Plaintiffs were justified in relying upon Defendants' representations.

98. As a direct and proximate result of Defendants' representations, Plaintiffs have suffered damages in amounts to be proven at trial.

## COUNT XI
## MALICE

99. Plaintiffs re-allege and restate each of the allegations contained in the preceding paragraphs 1-99 inclusive.

100. Defendants' actions constitute malice as defined by Montana law, to wit: Defendants had knowledge of facts or intentionally disregarded facts that created a high probability of injury to the Plaintiffs.

## UNKNOWN DEFENDANTS

101. Plaintiffs re-allege and re-state each of the allegations contained in the preceding paragraphs 1 through 101 inclusive.

102. Defendants JOHN DOES I-X, presently unknown to the Plaintiffs, may be directly and/or indirectly liable for any and all of the foregoing counts. This Complaint will be amended should Plaintiffs discover the existence or identities of any JOHN DOE Defendant.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment against Defendants as follows:

1. For reasonable compensation for Glen's mental and physical pain and suffering in the interval between the time he fell, sustained head injury and his subsequent death;

2. For all medical expenses sustained by Plaintiffs as a result of Glen's injuries;

3. For funeral expenses which were incurred as a result of Glen's death;

4. For reasonable compensation for grief, sorrow, mental anguish, and loss of companionship and consortium for Plaintiff and Glen's adult child;

5. For reasonable compensation for loss of financial support as a result

of Glen's death, to wit: for an award equivalent to Glen's reasonable earnings after the date of death during the remainder of his life expectancy;

6. For all general damages suffered by Plaintiffs, including pain and suffering, mental anguish and emotional distress in an amount to be determined at trial;

7. For an award of punitive damages pursuant to Mont. Code Ann. § 27-1-221 to punish Defendants and make an example of their conduct sufficient to deter similar conduct by the Defendants and other similarly situated entities in the future;

8. For all damages related to Glen's loss of chance for a recovery as outlined by Mont. Code Ann. § 27-1-739;

9. For cost of suit, attorney's fees, prejudgment interest and, for such other and further relief as this Court deems just and proper.

DATED this 13th day of February, 2009.

By: /s/ W. Adam Duerk
W. Adam Duerk
MILODRAGOVICH, DALE,
STEINBRENNER & NYGREN, P.C.
Attorneys for Plaintiffs

## DEMAND FOR JURY TRIAL

COME NOW the Plaintiffs and demand a jury trial on all issues of fact in the above case.

DATED this 13th day of February, 2009.

By: /s/ W. Adam Duerk
W. Adam Duerk
MILODRAGOVICH, DALE,
STEINBRENNER & NYGREN, P.C.
Attorneys for Plaintiffs